MID-TOWN PETROLEUM, INC., Plaintiff-Appellant, v. ROBERT M. GOWEN et al., Defendants-Appellees.

First District (5th Division)   No. 1—92—2849

Opinion filed February 26, 1993.

Katz, Randall & Weinberg, of Chicago (Warren Lupel and Charles E. Alexander, of counsel), for appellant.

Ernest L. Gowen & Associates, Ltd., of Oak Forest (Ernest L. Gowen, of counsel), for appellees.

JUSTICE COUSINS delivered the opinion of the court:

After a preliminary hearing, the trial court entered an order denying the motion of plaintiff, Mid-Town Petroleum, Inc. (Mid-Town), for a preliminary injunction to enjoin defendant, Robert M. Gowen (Gowen), from soliciting, calling upon, diverting, or taking away any of the customers or accounts of Mid-Town. Plaintiff, Mid-Town, files this interlocutory appeal pursuant to Supreme Court Rule 307(a) (107 Ill. 2d R. 307(a)).

On appeal, plaintiff contends that the trial court abused its discretion in denying plaintiff's request for preliminary injunction in that the trial court's findings are against the manifest weight of the evidence.

We affirm.

BACKGROUND

The plaintiff, Mid-Town, is in the business of selling and distributing petroleum products. The defendant, Paulson Oil (Paulson), is in the same business. Gowen was a 15-year employee, as a sales representative with Mid-Town from 1977 to April 7, 1992, when he resigned. In August 1991 while employed by Mid-Town, Gowen signed an employment agreement in which he agreed, among other things, to refrain from soliciting business from customers at Mid-Town for a period of 18 months following termination of employment. Gowen was promoted to sales manager simultaneously with the signing of the August agreement. A written job description of Gowen's duties as sales manager provided, among other things, that he would report to the chief executive officer (CEO). On April 6, 1992, Gowen was informed by the CEO that he would no longer report to the CEO. He formally resigned from Mid-Town the next day. On April 27, 1992, Gowen commenced employment as a sales representative for Paulson. Admittedly, he immediately began to solicit business from some customers he had serviced at Mid-Town.

On May 11, 1992, plaintiff, Mid-Town, filed its verified complaint against defendants, Gowen and Paulson, for injunctive and other relief. On motion of plaintiff for a temporary restraining order and preliminary injunction filed May 11, 1992, the trial court, on May 13, 1992, entered a temporary restraining order and set July 24, 1992, for hearing on the preliminary injunction motion. A hearing on the motion for preliminary injunction was commenced and concluded on July 24, 1992. At the conclusion of the hearing, the trial court determined that it was unlikely that the plaintiff would win on the merits concerning enforceability of the employment agreement. The court dissolved the temporary restraining order and denied the motion for preliminary injunction. Only two witnesses, William Battersby, chief executive officer of Mid-Town, and the defendant, Robert M. Gowen, testified at the hearing.

Battersby testified as follows.

Mid-Town is engaged in the business of distributing and selling lubricant oils, and he had served as president and chief executive officer since approximately May 1991.

Upon his election as president and chief executive officer, he initiated a practice of requiring all employees to sign an employment agreement. No such practice existed prior to 1991.

He informed Gowen, as he had all other employees, that he, Gowen, would have to sign the employment agreement or be discharged. Gowen initially refused to sign in July 1992. Then, on August 21, 1992, Gowen was also appointed sales manager, which was a new position at Mid-Town. At that time, Gowen signed the employment agreement.

Gowen received no consideration other than continuation of his employment in return for execution of the employment agreement.

In April 1992, Battersby told Gowen that he was going to change Gowen's responsibilities as sales manager so that, among other things, Gowen would no longer report to the CEO.

The salesmen would call Gowen on their car phones. Battersby felt it was taking too much time out of Gowen's selling. When informed of the change, Gowen mentioned that he thought it was in everyone's best interest that he leave Mid-Town's employment. Battersby thought Gowen viewed it as a major change in his sales management position and just didn't want to face the salesmen. Battersby rejected an offer of Gowen to stay on two weeks longer after resignation.

Mid-Town had six salesmen when the agreements were signed. Mid-Town now has four salesmen. Gowen has never been replaced as

sales manager. The position of sales manager had not existed prior to August 1991. It was Battersby's idea to create the position.

Battersby was 35 years old at the time of the evidentiary hearing. He had been employed at Mid-Town for approximately 12 years. He was hired by his father, Ray Battersby, who was his predecessor as president.

Gowen testified as follows.

Mid-Town had two salespersons already employed when he first started. He had 150 solid customers while employed with Mid-Town.

An employment agreement was presented to him in July by Battersby which he refused to sign. Battersby advised him that he would no longer work for Mid-Town if he refused to sign. Gowen again refused to sign in July.

Approximately four weeks later, Battersby again requested that he sign the employment agreement, and he again refused. A few days later, sometime during late August 1991, Battersby informed him that Mid-Town needed a sales manager and he qualified for that position. Battersby said he had no idea what a sales manager did and instructed Gowen to prepare a job description outlining what he felt the job of sales manager would encompass. He did so and presented it to Battersby a day or two later. Battersby glanced at it, told him it was fine, and offered him the job.

Battersby then asked him to sign the employment agreement. He signed. Gowen felt that the sales manager position was a window of opportunity for his career.

On April 6, 1992, Battersby informed him that there were going to be some changes taking place. He would no longer report to Battersby. He would no longer have responsibility for the salesmen. He would report to Ron Valacity, vice-president. The salesmen would report on a daily basis to Ron Valacity. He would be responsible only for the training of the salesmen, product training. The next day, he advised Battersby that this change was unacceptable and that he was resigning. Battersby told him he was doing them a favor. He received two weeks' vacation pay and a profit-sharing check for money he had accumulated.

In a letter to Mid-Town, written after his resignation, Gowen indicated that he signed the agreement in consideration of receiving the job as general sales manager. He worked for Keystone and sold lubricants for nine years before he began work for Mid-Town. He received no training when he went to work for Mid-Town. He wasn't assigned any existing accounts when he went to work for Mid-Town. He had no

specific territory. His last salary at Mid-Town was around $32,000 annually or $635 weekly.

The agreement regarding the sales manager's position provides: reporting to the CEO, William Battersby. The agreement further provides that the newly created position of sales manager will start by splitting the areas of responsibilities between 80% personal sales (with a stronger concentration on larger accounts) and 20% sales management duties. Every six months the percentages are to be reviewed. Duties of the sales manager are set forth. The duties include: sales training; coordinating specific market penetration *with* telemarketing and CEO; positive motivation; semi-annual reviews to start of all sales personnel, and developing long- and short-term marketing plans.

During the course of arguments, the trial court made the following comments:

"Sounds to me like the oral agreement to promote Mr. Gowen was combined with and based on consideration that he sign the employment contract. In other words, there was one contract which was the contract to promote him combined with his signing the employment contract. That's what it sounds like to me. Another question comes. Did the reduction in the duties of Mr. Gowen—were they so substantial as to terminate the sales manager's job except for holding training sessions for sales persons? In other words, they didn't report to him. He no longer had his position where he reported to the chief officer and president, but to a vice president like all the other sales persons, and I'd like to hear any arguments you might have against that.

Mr. Lupel: Sure, your honor. Two things. First, in order to find that the Court would have to disbelieve the plaintiff and believe the defendant, it was the plaintiff's testimony that this was not the case. That they were not signed contracts ***.

THE COURT: *** [W]e're talking about a conclusion of law as to whether or not they're combined contracts."

After the testimony of the witnesses Battersby and Gowen, the following proceedings ensued:

"Mr. Lupel: If the court please, the plaintiff has nothing further.

Mr. Gowen: Your honor, if I may, with plaintiff resting, I'd like to submit a motion for directed verdict.

THE COURT: I want to know if you have any other witnesses?

Mr. Gowen: I have nothing further.

THE COURT: Okay, for the record, I'm combining the motion for directed verdict and the closing arguments."

At the very conclusion of all proceedings, the court ruled:

"THE COURT: Okay. It is my decision that I can't say there's likelihood that plaintiff will win on the merits as to the enforceability of the employment agreement. And so, I am going to dissolve the TRO."

Plaintiff brings this interlocutory appeal.

OPINION

Although phrased in the negative, the sole finding which the trial court expressed in its decision at the conclusion of the hearing was that it was unlikely the plaintiff would prevail on the merits of the case. This is one of the issues on which a party seeking an injunction must carry the burden of persuasion.

We now consider whether or not the trial court's denial of the plaintiff's request for a preliminary injunction was against the manifest weight of the evidence thereby abusing discretion.

A party seeking a preliminary injunction must carry the burden of persuasion on four issues: (1) that there is no adequate remedy at law and there will be irreparable injury if the injunction is not granted; (2) the threatened injury to him will be immediate, certain, and great if the injunction is denied while the loss or inconvenience to the defendant is comparatively small and insignificant if granted; (3) there is a reasonable likelihood of prevailing on the merits of the case; and (4) there would be no injurious effect upon the general public. (*Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 1144, 441 N.E.2d 927, 931; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 398, 372 N.E.2d 125, 128; *McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 417, 364 N.E.2d 420, 421.) The trial court is vested with a large measure of discretion to grant or refuse to grant a preliminary injunction and its determination will not be overturned on review absent a showing of the abuse of discretion. (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 502, 392 N.E.2d 1148, 1151; *Office Electronics*, 56 Ill. App. 3d at 398, 372 N.E.2d at 128.) A preliminary injunction is an extraordinary remedy and should be granted with the utmost care. *Shorr Paper Products*, 74 Ill. App. 3d at 505, 392 N.E.2d at 1153; *Office Electronics*, 56 Ill. App. 3d at 398, 372 N.E.2d at 128.

■ The sole role of an appellate court in addressing the grant or refusal to grant an interlocutory decree in an action for injunctive re-

lief is restricted to a determination of whether the trial judge correctly exercised his broad discretionary powers. (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 690, 329 N.E.2d 414, 416-17.) Thus, a court of review looks to the sufficiency of the evidence not to determine controverted rights or to decide the merits of the case, but only for the limited purpose of ascertaining whether the trial court abused its discretion. *Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 500, 422 N.E.2d 1166, 1171; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 135, 345 N.E.2d 795, 798.

■ A post-employment restrictive covenant will be enforced if the terms are reasonable. *Millard Maintenance Service Co. v. Bernero* (1990), 207 Ill. App. 3d 736, 744, 566 N.E.2d 379, 384.

Illinois courts have signaled support for the rule that continued employment for a substantial period beyond the threat of discharge is sufficient consideration for a restrictive covenant. (*Office Electronics*, 56 Ill. App. 3d at 399 (agreement entered into 12 years after employment began is enforceable where employee continued working for over four years; covenant was a *"quid pro quo* of *** continued employment"*); *Smithereen Co. v. Renfroe* (1945), 325 Ill. App. 229, 243-44, 59 N.E.2d 545 (agreement entered into three years after employment began is enforceable because agreement was made "in consideration of the employment of defendant by the plaintiff" and defendant in fact "continued in the employ of plaintiff" for five more years).) Although not directly addressing the issue of consideration, other Illinois courts have enforced restrictive covenants entered into after employment began where the employee continued in the job for a substantial period. *Cockerill v. Wilson* (1972), 51 Ill. 2d 179, 281 N.E.2d 648; *Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433; *Shorr Paper Products*, 74 Ill. App. 3d 498, 392 N.E.2d 1148.

■ The defendant contends that the evidence fails to establish sufficient consideration to support the covenant in the employment agreement. We agree.

The facts addressed establish that Gowen had been in plaintiff's employment since 1977. None of plaintiff's employees had been asked to sign an employment agreement prior to July 1991. Gowen refused to sign the agreement in July 1991, although Battersby told him that he would be terminated if he didn't sign. Battersby then offered him the sales manager's position, which provided that he would report to Battersby, the CEO, among other duties. He did not sign the employment agreement until the sales manager position was offered and agreement reached as to the description of the sales manager position.

He continued employment from the end of August 1991 to April 6, 1992. The day before he formerly resigned, Battersby, among other things, told Gowen that he would no longer be reporting as sales manager to the CEO. At the time Gowen resigned, Battersby told him that he was doing them a favor. No sales manager position existed at Mid-Town before 1991, and none has existed since April 6, 1992.

During the course of arguments, the trial court commented:

"Sounds to me like the oral agreement to promote Mr. Gowen was combined with and based on consideration that he sign the employment contract. *** Another question comes. Did the reduction in the duties of Mr. Gowen—were they so substantial as to terminate the sales manager's job except for holding training sessions for sales persons?"

The defendant cited the *Millard* case before the trial court and argues its holding on appeal. (*Millard*, 207 Ill. App. 3d 736, 566 N.E.2d 379.) In *Millard*, the employee, Bernero, worked for Millard from September 1980 through January 26, 1989. He had no previous work experience in the field. He signed three post-employment agreements dated September 30, 1980, January 1, 1981, and November 21, 1985. After the third agreement, he continued employment until January 26, 1989. Continued employment for a substantial period was sufficient consideration. (*Millard*, 207 Ill. App. 3d at 745, 566 N.E.2d at 384.) In *Millard*, we note that the trial court issued a preliminary injunction based on a post-employment contract and the trial court's decision was affirmed.

Here, Gowen's continued post-contract employment was approximately seven months. We note, here, that Gowen's continued post-contract employment was comparatively insubstantial.

In *McRand*, defendants did not sign employment agreements when plaintiff hired them, but continued to be employed for eight years and nine years, respectively, after signing an original covenant and were employed for two years after signing the covenant before resigning. (*McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306.) In *McRand*, the appeals court stated: "We therefore find that sufficient consideration exists ***." *McRand*, 138 Ill. App. 3d at 1056, 486 N.E.2d at 1314.

The principles of *McRand* were applied in the recent case of *Corroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 494 N.E.2d 785. In *Corroon*, the court wrote: "[a]pplying these principles [of *McRand*] to the instant case, we conclude that, as a matter of law, sufficient consideration exists ***. The record shows that Magner signed the agreement on September 24, 1979, and resigned

on June 30, 1984. Thus, plaintiff gave to Magner four years of continued employment in exchange for signing the agreement." *Corroon*, 145 Ill. App. 3d at 163, 494 N.E.2d at 791-92.

Again, when measured with facts which support the holding in *Corroon*, the time period Gowen worked after the agreement is insubstantial. The time period Gowen worked before the agreement is substantial.

In this case, the trial court had to weigh the testimony regarding the offer, acceptance and reduction of the sales manager position. We believe the facts are sufficient to support a finding by the trial court that Gowen would not have continued employment without the offer to become sales manager.

Absent adequate consideration, a covenant, though otherwise reasonable, is not enforceable in equity. (*Millard*, 207 Ill. App. 3d at 744, 566 N.E.2d at 384.) Whether Gowen received adequate consideration is a question of fact in this case. Both fact and credibility issues were before the court. In a trial before the court without a jury, the credibility of witnesses and the weight to be accorded their testimony are still to be determined by the trier of fact. Unless manifestly against the weight of the evidence, the findings will not be disturbed. *Bauske v. City of Des Plaines* (1957), 13 Ill. 2d 169, 181, 148 N.E.2d 584, 591.

Finally, plaintiff strongly argues that any consideration is sufficient to support a contract. This argument is the bedrock of contract law. However, while a peppercorn can be considered sufficient consideration to support a contract in a court of law, a peppercorn may be insufficient consideration in a court of equity to support a prayer for the issuance of a preliminary injunction. Equity is defined as follows:

> "Justice administered according to fairness as contrasted with the strictly formulated rules of common law. *** The term 'equity' denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men with men." Black's Law Dictionary 540 (6th ed. 1990).

We hold that the trial court properly denied the plaintiff's motion for preliminary injunction and did not thereby abuse its discretion.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.