General Bumper Company and Robert Manewitz, Plaintiffs-Appellees, Cross-Appellants, v. Action Bumper Co., Daniel Gilbert, et al., Defendants-Appellants, Cross-Appellees.

Gen. No. 51,450.

First District, First Division.

December 12, 1966.

Rehearing denied January 4, 1967.

Rosenthal and Schanfield, Norman L. Rothenbaum and Henry M. Morris, of Chicago, for defendants-appellants.

Richard L. Mandel, of Chicago, for plaintiffs-appellees.

MR. PRESIDING JUSTICE KLUCZYNSKI delivered the opinion of the court.

This is an interlocutory appeal from a temporary restraining order. The sequence of events is as follows. On December 23, 1964 defendants, Daniel Gilbert, William Shlifka and Joseph Ciavirelli formed the plaintiff General Bumper Company whose business consisted of buying damaged automobile bumpers, repairing and replating them and selling them to garages and repair shops in the Chicagoland area.

The record before us indicates that each made a capital contribution of approximately $500. Subsequently thereto defendant Faulisi acquired an interest in the shares of Shlifka and Ciavirelli. Gilbert was made president and the others directors and were employed by General as driver salesmen. The duties of the driver salesmen consisted of soliciting business from garages and repair shops, picking up the bumpers, having them replated and selling them to customers.

Gilbert also owned other similar companies one of which was defendant Action Bumper Company, a direct competitor to General. Plaintiff Robert Manewitz managed Platelease Inc., one of Gilbert's other companies. Some time in early 1965 Shlifka, Ciavirelli and Faulisi indicated that they desired to sell their interest in General. Manewitz, originally representing Gilbert in negotiations for the sale, subsequently, on April 30, 1965, with Gilbert's acquiescence purchased the shares of Shlifka, Ciavirelli and Faulisi for himself for the sum of $7,000.

The agreement by which Shlifka, Caivirelli and Faulisi sold all their right, title and interest in General to Manewitz contained the following covenant:

"As a material part of the consideration for the payment by me to you of the purchase price of the shares of General, you and each of you agree that

you will not directly or indirectly, enter into any business activity whatsoever, as a stockholder, director, officer, employee, independent contractor, consultant, partner, sole proprietor or in any other capacity whatsoever, which competes with the business of General in the sale of new, used or replated automobile bumper parts within the Chicago metropolitan area for a period of one year commencing from the date of the termination of your employment with General. It is understood and agreed that monetary damages for the breach of this covenant on your part would be difficult if not impossible to ascertain, and that, therefore, in the event of breach or a threatened breach of this covenant, I shall, in addition to all other usual remedies, have the right to apply to a court of equity to enjoin you from any threatened or actual competing activities."

Shlifka, Ciavirelli and Faulisi remained as driver salesmen employed by General. Gilbert continued as shareholder of General with Manewitz for a few months and in May 1965 Manewitz exercised an option and purchased Gilbert's interest for $2,500. Although at Gilbert's suggestion the restrictive covenant was inserted in the prior sales agreement, no such restraint or covenant was included in the sale of Gilbert's interest.

In April 1966 difficulties arose with regard to the terms and arrangements of employment and Shlifka, Ciavirelli and Faulisi began negotiations with Gilbert to work as driver salesmen for Action. They severed their connection with General on April 29, 1966 and were employed by Action.

Plaintiffs brought the instant suit against all of the defendants charging that Shlifka, Ciavirelli and Faulisi, in violation of the restrictive covenant, were working for and attempting to divert plaintiffs' business to Action, a competitor, and were in a position to appropriate a large portion of plaintiffs' business, thereby greatly

262

diminishing the business; that Gilbert engaged in a competing company and with knowledge of the facts approached and persuaded Shlifka, Ciavirelli and Faulisi to breach said contractual obligations; that all of the defendants entered into a conspiracy to attempt to acquire customers and business from plaintiffs and in furtherance thereof Action and Gilbert did aid, abet and instruct Shlifka, Ciavirelli and Faulisi to appropriate plaintiffs' customers. Plaintiffs prayed that Shlifka, Ciavirelli and Faulisi be temporarily and permanently restrained from soliciting business of plaintiffs' customers; engaging in the sale of new, used or replated bumpers in the Chicago Metropolitan area for a period of one year commencing April 29, 1966 (the date alleged that they severed relationship with General) ; and that they be enjoined from entering into any business activity in competition with General for one year. The complaint contained a general prayer that the court restrain defendants from soliciting any business from any of plaintiffs' customers.

At the hearing on the motion for temporary injunction evidence was introduced indicating that General presently serviced 98 accounts while Action serviced over 700; that of General's 98 accounts, Action had made sales to 83 of them prior to the driver salesmen leaving General's employment; that of these latter 83 accounts Action had made substantial sales to 40 of them and had actually shared in the business of at least 10 of these accounts.

Gilbert testified that it was a common practice in the bumper rebuilding industry for customers to split accounts and it was also a common practice for driver salesmen "to go from one company to another seeking employment"; that neither he nor Action induced the driver salesmen to terminate their employment with General and to seek employment from Action.

Manewitz testified that he had reason to believe that Gilbert lured the driver salesmen from his employ and al-

263

though a customer might make an isolated purchase from a bumper company with whom he was not primarily dealing, when his primary source would not supply a particular bumper, it was unusual practice in the industry to "split" his account. He further testified that the driver salesmen were responsible for 80 to 90% of General's business; that only one other driver salesman was employed by General; that subsequent to the driver salesmen's departure the business had declined due to their efforts on behalf of Action and that he did not believe there were approximately 40 companies to whom both Action and General sold bumpers. The court issued the temporary injunction order as follows:

> 1. Defendants William Shlifka, Robert R. Faulisi and Joseph Ciavirelli, their agents, employees, attorneys, companies, partners, corporations or any parties acting on their behalf be and they are hereby enjoined until April 29, 1967 from directly or indirectly, selling, soliciting, attempting to sell, calling on or aiding the solicitation or sale of new, used or replated automobile bumpers or bumper parts to any of the individuals or companies or employees or agents of said companies to whom they sold or upon whom they called during their employment by General.
> 2. Action Bumper Co. and Daniel Gilbert be and the same are hereby enjoined until April 29, 1967 from selling, soliciting, attempting to sell, calling on or aiding the solicitation or sale of new, used or replated automobile bumpers or bumper parts to accounts to whom the defendants Shlifka, Faulisi or Ciavirelli sold or upon whom they called during their employment by General.

It is the contention of Shlifka, Ciavirelli and Faulisi that the restrictive covenant was ancillary to a contract of employment and its validity "must necessarily be

tested by the precepts of law applicable in an employer-employee relationship."

 We do not agree. The covenant was part of an agreement for the sale of all their right, title and interest in the business and although it referred to "termination of employment" it set out no terms, conditions of details of such employment. Considering the entire agreement and its purpose, it is clearly indicated that the parties contemplated that the drivers would remain some time with General and upon termination of that connection or relationship they would not enter into any competitive activity within a definite area or for a definite period. This covenant was ancillary to the sale of their interest in the business. It was held in McCook Window Co. v. Hardwood Door Corp., 52 Ill App2d 278, 202 NE2d 36, p 289 that:

> Since a difference exists in the nature of the interests sought to be protected in the case of an employer and that of a purchaser, decisions in one area cannot be of significant value or weight in the other. Northwest Side Lumber Company v. Layton, 239 Ill App 82 (1925); Restatement, Contracts § 515, comment b (1932).

In McCook it was also held that:

> The enforceability of a restraint ancillary to the sale of a business or property depends on the reasonableness of the restraint as to time and as to the extent of the territory; neither one is conclusive but both are important factors in the determination of the reasonableness of the restraint.

We find that in applying these tests the restraining covenant was reasonable and not against public policy and, therefore, was valid and enforceable. The No. 1 paragraph of the injunction order is affirmed.

With regard to the No. 2 paragraph, Action and Gilbert contend that it deprived them of effectively competing

with General; that it has thrown a protective shroud over General's customers by enjoining Gilbert and Action from selling or soliciting accounts to whom the employees sold or upon whom they called while employed by General; that the order thus reserves certain customers to General on an exclusive basis, and prevents Action and Gilbert from continuing to sell to many customers of Action obtained long before Action hired employees; that this improperly gave General the right to monopolize customers who were previously served by both Action and General. We agree.

There is no basis in law or in fact in this cause whereby the broad restraining order against Action and Gilbert can be justified.

■ While the evidence regarding the number of General's customers with whom Action had prior dealings is vague, it is admitted that Action had very substantial business dealings with at least 10 such customers prior to the salesmen quitting employment with General. The effect of the injunction order against Gilbert and Action prevents them from selling to these so-called common customers and gives General a competitive advantage by allowing it to monopolize customers formerly serviced by both Action and General.

■ This type of competitive advantage was passed upon in Corica v. Ragen, 140 F2d 496 (7th Cir 1944), wherein it cautioned at page 499 that:

> A court of equity must exercise its discretion in such manner as to safeguard the interests of both parties, and, in certain circumstances . . . it is an abuse of judicial discretion to issue an injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ.

There is no adequate basis for enjoining Gilbert and Action from selling to customers with whom the salesmen had contact when they worked for General. Neither Gilbert nor Action was a party to the agreement containing the restrictive covenant and there is no contractual basis to support the injunction order. We further find no credible evidence of any conspiracy by Gilbert and/or Action to induce the salesmen from General's employ or to otherwise deprive General of its business.

There being no basis in law or in fact for upholding the injunction order against Gilbert and Action, that part of the restraining order is reversed.

Judgment affirmed in part; reversed in part.

MURPHY and BURMAN, JJ., concur.