AMERICAN HARDWARE MUTUAL
INSURANCE COMPANY, Plaintiff,

v.

John P. MORAN, et al., Defendants.

No. 82 C 3314.

United States District Court,
N. D. Illinois, E. D.

July 20, 1982.

Kalvin M. Grove, Alan L. Unikel, Steven P. Cohn, Fox & Grove, Chicago, Ill., for plaintiff.

Roger B. Harris, Kenneth R. Gaines, Mary Rose Gage, Jan Feldman, Altheimer & Gray, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

American Hardware Mutual Insurance Company ("American Hardware") has sued John P. Moran ("Moran") and Frank B. Hall and Co. of California ("Hall") for antitrust violations (Counts I and II), breach of a covenant not to compete (Count III) and various acts of unfair competition (Counts IV and V). American Hardware moved for a preliminary injunction on Count III [1] and this Court conducted an evidentiary hearing. In accordance with Fed.R.Civ.P.

---

1. American Hardware's original written motion asked for a preliminary injunction on Counts III, IV and V. But because it failed to present any evidence as to Counts IV and V at the hearing, it must be deemed to have dropped its

("Rule") 52(a) this memorandum opinion and order reflects the Court's findings of fact and conclusions of law. For the reasons stated in this opinion American Hardware's motion for a preliminary injunction is denied.

*Findings of Fact ("Findings")*

Although there were no serious factual disputes at the hearing, none of the following Findings should be taken as ultimate findings of fact.[2] Based on the evidence adduced at the hearing, however, the Court finds (and to the extent the Conclusions later in this opinion also contain references to, and inferences from, the evidence, they are intended to constitute Findings as well):

1. American Hardware is a Minnesota corporation with its principal place of business in Minneapolis. It is in the business of selling insurance and specializes in selling package insurance plans to businesses. It carries on part of its business in Illinois.

2. Hall is a California corporation also engaged in the business of selling insurance. Its only business is the sale of package insurance plans to auto, truck and motorcycle dealers. It regularly sells in the State of Illinois.

3. American Hardware hired Moran in January 1977 to sell insurance in the Illinois counties of Cook, DuPage, Kane, Lake and McHenry. Moran was one of a number of American Hardware salesmen sharing that territory on a non-exclusive basis.

4. Moran had no prior experience in selling insurance (though he had been a successful salesman) but received training from American Hardware. That training included a five-week period of schooling in the basics of commercial insurance, in part to enable Moran to take certain certification exams, as well as early on-the-job training by experienced American Hardware salesmen. In principal part the training imparted to Moran the general skills of carrying on the selling of commercial insurance, not matters unique to American Hardware and its business.

5. At all times since February 11, 1977 Moran worked under a written employment agreement in American Hardware's printed form, which contained a restrictive covenant in the event Moran should cease working for American Hardware. In the most recent employment agreement (signed about September 1, 1981) Moran (the "Field Representative") and American Hardware (the "Employer") agreed:

6. Any and all insurance business procured by or allocated to the Field Representative while in the employ of the Employer, and the expiration and renewal rights thereto, shall be the permanent and exclusive property of the Companies and shall be for the Companies' exclusive benefit. In this connection the Companies shall have the exclusive right, title and interest in and to all materials, services, and information pertaining to such business, whether in the possession of the Field Representative or the Companies, including but not by way of limitation, all records of insurance policies, manuals, communications, sales and promotion materials, telephone listings, secretarial and telephone services, policy expiration dates, and the names, telephone numbers and addresses of existing or prospective policyholders. On termination of Field Representative's employment, all such materials, services and information shall be immediately surrendered to the Employer, whether provided by the Companies or prepared by the Field Representative, and will not thereafter be used by Field Representative.

7. During his or her employment and for a period of two years following the date of termination of his or her employment with the Employer, the Field Representative will not engage directly or indirectly, personally or through any other person in any of the following prohibited activities:

motion for a preliminary injunction on those counts.

2. Rule 65(a)(2) governs the effect to be given evidence adduced at the preliminary injunction hearing.

(a) The Field Representative will not in any way attempt to effect the discontinuance of the Companies' insurance business, or attempt to effect a renewal or replacement of any part thereof by another insurer: (1) within the territory assigned hereunder; (2) within any other territory assigned or worked by him or her for the Employer within two years prior to the date of termination of employment, whether employed as a Field Representative or in any other capacity with the Companies;

(b) The Field Representative will not, on his or her own behalf or for any other insurer, agent, broker or salesman, accept or effect the placement of any renewal or replacement in whole or in part of any insurance being provided by the Companies: (1) within the territory assigned hereunder; (2) within any other territory assigned to or worked by him or her for the Employer within two years prior to the date of termination of employment, whether employed as a Field Representative or in any other capacity with the Companies;

(c) The Field Representative will not divulge to any person of the information described in section 6 above with respect to the Companies' existing or prospective policyholders;

6. During his tenure with American Hardware Moran became particularly successful in marketing a "package policy" to automobile, truck and motorcycle dealers. Moran was able to develop about 70 commercial accounts of which over 40 were vehicle dealers. All but one of those dealer accounts came from "cold calls" by Moran or from other sources originating with Moran's efforts. They did not come from existing American Hardware accounts when Moran was hired, or even from leads obtained from American Hardware. Even the one exception was a company lead that became a customer through Moran's efforts, for he was successful in getting the customer's business only in the third year he worked on trying to sell the account.

7. Moran quickly became one of American Hardware's most successful salesmen and therefore one of the highest earners among its salesmen, because his compensation was entirely on a commission basis. During the past one and one-half years, competition in the insurance lines in which Moran had come to specialize became very keen. American Hardware took a firm stand on retaining its rate structure without adjustment, while its competitors were cutting their rates. Indeed American Hardware put a substantial rate increase into effect April 1, 1981.

8. Moran thus found American Hardware rates had become 20% to 40% higher than those of its competitors. Competition in the commercial insurance field is highly rate-sensitive, with most customers unwilling to stay with an insurance agent if the product he is selling costs considerably more than what is available from competitors. As a result Moran's commissions declined sharply in 1981.

9. In January 1982 Moran terminated his employment with American Hardware effective February 1. Moran immediately took a position with Hall selling package policies to auto, truck and motorcycle dealers in the Illinois area.

10. Before Moran left American Hardware he advised them he would be joining Hall. Moran scheduled his departure to facilitate American Hardware's transition in handling the business, introduced his supervisor to the most important accounts (there had been no prior contact by other American Hardware personnel with such accounts), and took all reasonable steps to maximize American Hardware's ability to serve those accounts if they wanted to remain with American Hardware.

11. Since leaving his employment with American Hardware Moran has communicated with some 20 of his former accounts (he did so on his own initiative only after Hall advised him it believed the American Hardware restrictive covenant was unenforceable). To date, Moran has sold insurance policies to 12 vehicle dealers previously insured by American Hardware. Several of

those dealers, however, sought out Moran before he solicited their business. Customer loyalty and goodwill in the business in which Moran engages inheres in the individual handling the account rather than in the insurer whose policy is being sold.

12. At the time he left American Hardware's employ, Moran took with him several production reports, monthly reports reflecting the sales generated by him as a salesman. Those reports contain general information about the policies written, their expiration dates and premiums. Moran has not, however, looked at those reports or used them for solicitation of customers since leaving American Hardware's employ. His reason for retaining them was to be able to check on American Hardware's payment, after his departure, of commissions due him on such sales. Moreover under the circumstances of the business involved, neither the nature of the policy coverage nor the premium is "confidential information."

### Conclusions of Law ("Conclusions")

Our Court of Appeals has again recently restated the well established criteria to be applied in determining the propriety of preliminary injunctive relief in *Machlett Laboratories, Inc. v. Techny Industries, Inc.,* 665 F.2d 795, 796–97 (7th Cir. 1981).[3] As adapted to this case, a plaintiff must show each of the following:

(1) It has at least a reasonable likelihood of success on the merits.

(2) It has no adequate remedy at law and will otherwise be irreparably harmed.

(3) Its threatened injury outweighs the threatened harm the preliminary injunction may cause defendants.

(4) Granting the preliminary injunction will not disserve the public interest.

This Court finds American Hardware has failed to satisfy any (let alone all) of those requirements.

### Reasonable Likelihood of Success

Under Illinois law[4] the fact that a restrictive covenant has been breached is not by itself a sufficient basis for granting an ex-employer relief. As the Court stated in *Hydroaire, Inc. v. Sager,* 98 Ill.App.3d 758, 765, 53 Ill.Dec. 928, 937, 424 N.E.2d 719, 725 (1st Dist. 1981):

> In essence, plaintiff must show injury to its legitimate business interests separate and distinct from defendants' breach of the restrictive covenant in order to secure enforcement thereof through injunctive relief; otherwise, such covenant is deemed an unenforceable attempt to prevent competition *per se.*

Thus the question is whether the restrictive covenant in Moran's employment contract protected "a legitimate business interest" of American Hardware. American Hardware has claimed a legitimate business interest in its customers as well as certain confidential information allegedly imparted to Moran. Each of those contentions will be examined separately.

#### 1. Customers

Several recent Illinois opinions have considered when the identity of a business'

---

**3.** There is a question whether, under *Erie v. Tompkins* principles, federal or state standards for the issuance of a preliminary injunction should govern in diversity cases. In this Court's view, so long as state law permits the issuance of an injunction for the particular substantive right at issue, federal law should provide the criteria for issuance of an injunction. See 7 Moore's Federal Practice, ¶ 65.18[1]. Although our own Court of Appeals has not discussed the problem, it has recited the same four standards indiscriminately in diversity and federal question cases. In any event the question does not appear to be of practical significance, because the criteria for the issuance of a preliminary injunction are nearly identical under federal and Illinois law. Compare *Machlett Laboratories* with *McCormick v. Empire Account Services, Inc.,* 49 Ill.App.3d 415, 417, 7 Ill.Dec. 259, 260, 364 N.E.2d 420, 421 (1st Dist. 1977). Indeed *McCormick* cited *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976) as authority for the proper standards to be applied in determining whether a preliminary injunction should issue.

**4.** This is a tort or breach of contract diversity action in which all defendants' allegedly unlawful acts occurred in Illinois. Accordingly under Illinois choice of law principles Illinois substantive law applies to this action.

customers constitutes a legitimate business interest protectible by a restrictive covenant. Those cases establish that the mere existence of the customer relationship does not of itself establish such a protectible interest. If an employee is to be prevented from competing with a former employer, the employee must have gained some unfair advantage by virtue of his former employment.

For example in *Frank B. Hall & Co., Inc. v. Payseur*, 78 Ill.App.3d 230, 33 Ill.Dec. 522, 396 N.E.2d 1246 (1st Dist. 1979) a restrictive covenant was enforced against an insurance salesman where:

(1) Plaintiff had acquired the insurance business and customers through the purchase of another insurance agency at a cost of approximately $7 million.

(2) Most of the customers were of long standing indeed, having been acquired at the time of the purchase and then continuing to use plaintiff's services for at least six years after the purchase.

(3) Defendant had been a stockholder of the business acquired by plaintiff, and had executed the restrictive covenant in connection with the sale (his share of the proceeds had been some $400,000).

Thus that case involved the potential loss of long-established customers plaintiff had expended a large sum of money to secure—free market evidence that the goodwill (unlike the situation here) was that of the plaintiff not the defendant. See also *Wessell Co., Inc. v. Busa*, 28 Ill.App.3d 686, 329 N.E.2d 414 (1st Dist. 1975) (company had files containing confidential pricing information and customer requirements accumulated over a 15 year history); *Wolf & Co. v. Waldron*, 51 Ill.App.3d 239, 9 Ill.Dec. 346, 366 N.E.2d 603 (1st Dist. 1977) (plaintiff lost customers of 30 and 10 years' standing).

Here the facts paint a very different picture. First, it was Moran who brought all but one customer to American Hardware. Second, Moran only worked for American Hardware for five years. Thus none of the accounts was of long standing. Indeed given the rate of growth of Moran's commissions, it was not until 1979 and 1980

that most of the customers were probably brought to American Hardware (Robinson Aff. 6). Equally significant, the evidence shows that the customer relationships were really with Moran personally rather than with American Hardware (and Moran simply acting as its surrogate). Finally the case law makes plain that anti-competitive provisions are more readily enforced where entered into as part of the sale of a business (as in *Hall v. Payseur*) than where merely part of an employment contract (as here). See *McCormick v. Empire Account Service, Inc.*, 49 Ill.App.3d 414, 7 Ill.Dec. 259, 364 N.E.2d 420 (1st Dist. 1977). Thus this case does not involve the sort of long standing customer-employer relationships that constitute a legitimate proprietary interest.

Customers (more accurately patients) were also held to create a legitimate business interest in *Canfield v. Spear*, 44 Ill.2d 49, 254 N.E.2d 433 (1969). There a young doctor joined a medical practice straight out of medical school and signed a restrictive covenant in which he agreed not to practice medicine in the Rockford, Illinois area if he left plaintiffs' practice. In upholding the covenant the Court noted (44 Ill.2d at 51–52, 254 N.E.2d at 434):

In this case the defendant had never lived in Rockford before he joined the clinic in 1965, nor did he bring any patients with him. He was a newcomer to the community, and it was doubtless through the opportunities provided by this association that he became known in the city.

As the court said in *Hydroaire*, 98 Ill.App.3d at 765, 53 Ill.Dec. at 936, 424 N.E.2d at 724, in interpreting *Canfield*:

The employee would not have had contact with the customers absent his employment by plaintiff....

Again the facts here are very different. Moran sought out and solicited the customers American Hardware now seeks to restrain him and Hall from dealing with. Moreover the vehicle dealers in the region are all listed in public phone books and directories and can be easily discovered by anyone wanting to sell insurance. Thus Moran did not become aware of the custom-

ers by virtue of any benefit bestowed upon him by American Hardware. *See, Lincoln Towers Insurance Agency v. Farrell*, 99 Ill. App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034 (1st Dist. 1981) (even though involving no restrictive covenant).

Courts have also found a protectible business interest where an employee gains knowledge during his employment that makes him particularly able to secure business from certain customers. For example, in *Tower Oil & Technology Co., Inc. v. Buckley*, 99 Ill.App.3d 637, 54 Ill.Dec. 843, 425 N.E.2d 1060 (1st Dist. 1981) the employee was involved in the sale of lubricant. Substantial knowledge was required to determine which lubricant a particular customer needed (99 Ill.App.3d at 643–44,. 54 Ill.Dec. at 849, 425 N.E.2d at 1066):

> It is undisputed that the turnover of customers at both Tower and Tri-State was very small. Affidavits of customers stated that because of the expense and inconvenience of testing lubricants, it is very difficult for a competitor to acquire business from a company which has a satisfactory supplier. Prior knowledge of the needs of a prospect, the type of products which would satisfy these needs and the application of these products would certainly assist a salesman in persuading the prospect to change its supplier.

See also *Wessell Co.*, 28 Ill.App.3d at 689, 329 N.E.2d at 416 (knowledge of customer requirements accumulated over 15 years).

Once more the facts here are in direct contrast. Vehicle dealers' insurance needs are of defined types, and the policies are pretty much standard products. Contracts are provided for a one year period and customers are extremely price sensitive. There is frequent switching whenever a significant difference in premium costs arises. Moran's decision to "specialize" in selling to vehicle dealers was his own, one available to any salesman having the same general knowledge of commercial insurance learned with American Hardware or any of its competitors. Moran's success stemmed from his being a good salesman who worked hard at his business—not from special skills imparted to him by American Hardware. While he did gain general knowledge of the insurance business from American Hardware, any experienced insurance agent would have an equal chance at soliciting the business of the vehicle dealers. Accordingly this Court has found Moran did not derive from American Hardware any special knowledge of the needs of the various customers such as to constitute a business interest protectible by American Hardware.

Several Illinois cases have denied enforcement of restrictive covenants in factually analogous situations. For example in *Hydroaire*, 98 Ill.App.3d at 766, 55 Ill.Dec. at 937, 424 N.E.2d at 725, the court denied relief to a plaintiff involved in the selling and repair of industrial sealing devices:

> While clientele may properly be called the customers of a particular business, they cannot be considered the "property" of that business. While a business can have a proprietary interest in lists of customers which it maintains, no business has a proprietary interest in the customers themselves. Neither was anything learned by Sager during his employment, although plaintiff now seeks to prevent him from using such knowledge.

Likewise in *Image Supplies, Inc. v. Hilmert*, 71 Ill.App.3d 710, 712, 28 Ill.Dec. 86, 88, 390 N.E.2d 68, 70 (1st Dist. 1979) the court refused to enforce a restrictive covenant:

> The names of the customers with whom plaintiff dealt were all listed in the telephone book and in at least three professional publications. Any person could speak to a purchasing agent of these customers simply by use of the telephone.

See also *Iroquois Industries Corp. v. Popik*, 91 Ill.App.3d 505, 415 N.E.2d 4 (1st Dist. 1980); *McCormick v. Empire Account Services, Inc.*, 49 Ill.App.3d 414, 7 Ill.Dec. 259, 364 N.E.2d 420 (1st Dist. 1977). Under those cases this Court finds American Hardware has failed to demonstrate a protectible business interest in its customer list.

### 2. *Confidential Information*

Another source of an enforceable protectible business interest may be confidential

information. While such information need not rise to the level of a trade secret, it must be truly confidential and treated as such by the employer. American Hardware contends Moran has appropriated two items of confidential information: (a) production reports and (b) skills learned during his training at American Hardware.

### (a) *Production Reports*

When he left American Hardware Moran took with him certain monthly production reports to be able to verify the post-termination payment of commissions due him. Those reports do contain three items of information: the nature of customers' current policies, the premiums and expiration dates. Neither of the first two items is "confidential information." As the evidence demonstrated, vehicle dealers freely reveal the nature and prices of their current policies in an attempt to determine if they can obtain a lower priced policy. Indeed one of the sources of Moran's success stems from his ability to analyze a customer's needs and suggest the kinds of policy coverage needed, rather than just trying to be price-competitive on the existing coverage. Thus the nature of a customer's policies and the premiums the customer is paying do not constitute confidential information.

However, a policy's expiration date can be of obvious use to an insurance salesman. Clearly the period just before expiration of an insurance contract is the best time to solicit business.[5] But the unrefuted evidence is that Moran (1) did not look at the production reports after leaving American Hardware and (2) called on several former American Hardware customers *after* their contracts had expired. Thus there is no showing Moran obtained any advantage from knowledge of expiration dates (any

such advantage would have only a minimal effect in any case). While this Court might find expiration dates constitute confidential information, American Hardware has failed to prove Moran improperly appropriated such information or was able to use it to any advantage.

### (b) *Skills Learned During Training*

American Hardware contends it imparted confidential information in terms of its pricing policies and sales techniques during the course of Moran's training. But it is well established that, *Schulenberg v. Signatrol*, 33 Ill.2d 379, 387, 212 N.E.2d 865, 869 (1965):

> [A]n employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer.

In other words an employee cannot be forced to erase from his mind all the knowledge and skills that he acquired during prior employment. *Revcor, Inc. v. Fame, Inc.*, 85 Ill.App.2d 350, 357, 228 N.E.2d 742, 746 (2d Dist. 1967). American Hardware has failed to demonstrate any information communicated during the training process was of a confidential or secret nature.

For all the reasons already discussed, American Hardware has not crossed the initial threshold of proving a reasonable likelihood of success on the merits. Though the teaching of the cases makes consideration of the other three factors unnecessary, this opinion will touch briefly on each of them.

### *Adequate Remedy at Law (Irreparable Harm)*[6]

■ Even if the result in the preceding section had been otherwise—with American

---

5. Expiration dates are not the only time a customer is ripe for solicitation. Moran, not using any knowledge of such dates, called on a number of customers "out of season" and was successful in obtaining their business. All a customer loses on switching coverage during a policy term is the "short-rate" differential (normally the cost for the expired portion of the policy is 110% of a straight pro-rata charge). Where American Hardware's premiums are

considerably higher than its competitors', the customer is obviously willing to bear the slight extra cost to obtain an even greater economic advantage.

6. As the court noted in *Hydroaire*, 98 Ill.App.3d at 767, 55 Ill.Dec. at 938, 424 N.E.2d at 726:

> Having failed to establish a protectible interest, *a fortiori*, plaintiff cannot show that it

Hardware proving a protectible interest and the actual or prospective loss of business because of Moran's conduct—the inquiry would not be at an end. Loss of customers alone is an insufficient basis for the issuance of a preliminary injunction. Adequacy of a legal remedy must also be considered: whether after a trial on the merits the amount of damages could readily be calculated and would afford a sufficient remedy.

In *Wessell Co.*, 28 Ill.App.3d at 692–93, 329 N.E.2d at 419, the court found irreparable injury because:

> The uncontroverted evidence shows that if defendant is permitted to continue his course of action in violation of the restrictive covenant, plaintiff's long standing relationship with certain customers may be irrevocably disrupted, and that plaintiff has lost or will lose their business.

By contrast, the situation in this case is much closer to that expressed by the court in denying injunctive relief in *Hydroaire*, 98 Ill.App.3d at 767, 55 Ill.Dec. at 938, 424 N.E.2d at 726:

> Moreover, plaintiff does not indicate how it will be prevented from competing on a fair and equal basis for customers as a result of his violations.

After all, Moran left American Hardware because its raised premium rates made its policies non-competitive.[7] No reason has been shown that American Hardware, if it chose to do so, could not resume its competitive position to go after the same customers "on a fair and equal basis."

Moreover even assuming the restrictive covenant were enforceable in accordance with its terms, all that is at stake under the facts here is at most two years' premiums (perhaps less, see n.5) from a finite group of customers. Moran would in any case be free to solicit those customers once the two years were up (as Hall—without Moran—

and other competitors can do even now). And with no established customer loyalty to American Hardware—as distinct from Moran individually—having been shown, its financial loss for the limited period would be precisely measurable and fully recoverable in damages.

This is not the stuff of which findings of "irreparable harm" or "inadequate remedy at law" are made. American Hardware fails this second branch of the preliminary injunction test as well.

### Balancing of Harms

Threatened injury to American Hardware can be viewed in terms of its position if preliminary injunctive relief is denied and it ultimately proves successful on the merits (despite the improbabilities already discussed). In that case it would be able to recover damages for the loss only of what it has failed to prove constitutes a significant part of its business. Only 40 customers are involved and the evidence shows (1) two of those accounts were voluntarily terminated by American Hardware, (2) Moran has sought but failed to obtain business from several and (3) several customers sought Moran out on their own. Thus American Hardware is faced with the loss of perhaps 20 or 30 customers at most. There is no indication such a loss would be disruptive of its business in a way that damages cannot recompense.

Conversely if injunctive relief were granted and Moran and Hall ultimately prevailed on the merits, they would have been deprived of the benefit of customer relationships Moran personally has developed. Those accounts represent the lion's share of his business contacts. Loss of continuity because of the two-year hiatus in his dealing with them could be seriously damaging and make it difficult to rebuild the goodwill

---

suffered irreparable injury ... or that it lacks an adequate remedy at law.
Nonetheless American Hardware's independent failure to satisfy the second prong of the preliminary injunction test merits discussion.

7. Even to prove damages at an eventual trial on the merits American Hardware would have to demonstrate it was Moran's actions—not the increase in premium costs—that caused it to lose business. Thus its increased premium costs also decrease American Hardware's chance of success on the merits.

Moran (not American Hardware as a corporation) has created. And unless the injunction had been wrongfully granted (a very different question from simply reaching another conclusion on the ultimate merits), defendants would not be able to recoup in damages for the resulting loss—though even if recoverable, damages would be an inadequate remedy in any case under the circumstances.

Nor is the analysis changed by the fact that other vehicle dealers are customers available for solicitation by either litigant. That argument clearly cuts both ways.

As might be expected from the non-irreparability of American Hardware's claimed injury, then, the balancing of harms also favors defendants. American Hardware has not succeeded on this third issue either.

### Public Interest

There is to be sure a substantial public interest in compliance with contractual undertakings. But the public interest in competition, in the fostering of free market forces, is strong indeed. Here the employment agreement might be argued to possess some of the characteristics of a contract of adhesion. That question need not however be decided now. It is enough to say that the competing considerations identified in this paragraph bar any conclusion that denial of a preliminary injunction would clearly disserve the public interest. *See, Machlett Laboratories*, 665 F.2d at 798.

### Conclusion

■ American Hardware has failed to demonstrate it has a reasonable likelihood of success on its claim that Moran breached an enforceable restrictive covenant. American Hardware has also failed to establish any of the three other criteria for preliminary injunctive relief. Accordingly American Hardware's motion for a preliminary injunction on Count III is denied.